HIGHWAY TRUCK DRIVERS AND HELPERS, LOCAL 107, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, by its Trustee ad litem Michael Hession

v.

MOTOR TRANSPORT LABOR RELATIONS, INC., and Fees, Inc., and Edward K. Tryon Company.

Civ. A. No. 36122.

United States District Court
E. D. Pennsylvania.
Aug. 12, 1964.

Wilderman, Markowitz & Kirschner, by Richard H. Markowitz, Philadelphia, Pa., for plaintiff.

Schnader, Harrison, Segal & Lewis, by John W. Pelino, Philadelphia, Pa., for Fees, Inc.

Cohen, Shapiro, Berger & Cohen, by David Berger, and Herbert B. Newberg, Philadelphia, Pa., for Edward K. Tryon Co.

WOOD, District Judge.

This is an action brought under the National Labor Relations Act, Section 301, 29 U.S.C.A. § 185, wherein the plaintiff Union seeks a preliminary injunction.

The defendant, Motor Transport Labor Relations, Inc. (hereinafter M.T.L.R.) is an association of motor carriers organized and existing for the purpose of representing its members in collective bargaining with the plaintiff Union. Fees, Inc., a member of M.T.L.R., is a contract carrier which for many years pursuant to a contract performed hauling services for Supplee-Biddle-Steltz Company, a hardware and sporting goods concern. The remaining defendant, Edward K. Tryon Company, (hereinafter Tryon) which is not a member of M.T.L.R., acquired the assets, tradename and good will of Supplee-Biddle-Steltz Company on or about January 1964. The consolidated company now operates under the trade name of Tryon-Supplee-Biddle and is still engaged in the wholesale hardware and sporting goods business.

As part of the consolidation of the two companies, Tryon decided to cease its private carrier operations entirely, and to switch over to contract carrier transportation services. A private carrier is a concern which employs its own drivers, helpers and utilizes its own trucks to deliver its merchandise. A contract carrier supplies the drivers, helpers and trucks and performs the transportation for other concerns pursuant to a contract.

Upon learning of Tryon's decision to eliminate its transportation services, the Plaintiff Union recommended that the drivers and helpers terminate their employment with Tryon and become employees of Fees, Inc. This suggestion was heeded by the Tryon drivers and they were placed on Fees' payroll.

When the nine drivers from Tryon became Fees' employees, a question of seniority arose as to whether the Tryon drivers or the Fees drivers would have paramount seniority rights.

The plaintiff Union when consulted on this problem directed that the former Tryon employees be placed at the top of the seniority list and that the Fees' people were to be relegated to the bottom of the list regarding the work which Fees was going to perform for the new concern, Tryon-Supplee-Biddle.

In the trucking business, seniority often becomes the all-important factor in determining which employees will receive the most work when a merger or consolidation of two concerns occurs.

Naturally, the Fees' employees were dissatisfied with this seniority determination by the Union. One Fees' employee, a shop steward, filed a grievance pursuant to the collective bargaining agreement, Article VII, entitled "Grievance Machinery," requesting a determination of the seniority question between the two groups of drivers. Eventually the grievance was submitted to the Joint Area Committee in accordance with Section 4 of Article VII for a decision.[1]

The Joint Area Committee conducted a hearing and on May 4, 1964, rendered a decision which held that the former employees of Fees be merged on the current seniority list of Fees based on the original date of hire with either Tryon or Fees. The procedure for such a merger of employees is known as "dovetailing."

---

1. Article 7, Section 4, Subsection (b).
"Where the Joint Area Committee by majority vote settles a dispute, such decision shall be final and binding on both parties with no further appeal."

■ The Union contends that this decision results from an erroneous application of the provisions of the collective bargaining agreement by the Joint Area Committee. It is further argued by the Union that since Tryon purchased Supplee-Biddle-Steltz, that no merger took place and that the Joint Area Committee committed an error of law when it applied the seniority provisions of the contract applicable to mergers, purchases, acquisitions and sales, et cetera.[2] The ken of the Union's position is that Tryon was merely a private carrier which ceased its private operation and became what is known in the trade as a *house*

*concern.* A *house concern* is a private carrier which has delivered its own freight with its own truck and driver and decides to discontinue such method of operation and elects to lease or hire a truck and driver from an Employer such as Fees—a contract carrier.

The collective bargaining agreement prescribes different seniority rules for *house concerns,* wherein Article 5, Section 5, states that drivers formerly employed by such organizations hold seniority on the work of the house concern as if actually employed by such companies.[3]

2. Article 5, Section 1 of the Contract provides in pertinent part as follows:
"* * * Any controversy over the seniority standing of any employee on the seniority list shall be submitted to the Joint Grievance Procedure (Article 7)"
Article 5, Section 4 of the Contract provides:
"Section 4.—(a) The uniform rules as to application of seniority in the case of mergers, purchases, acquisitions and sales, etc. shall be those adopted by the Central States Joint Area Committee."
The seniority rules adopted by the Central States Joint Area Committee, in relevant part, provide:
"APPLICATION OF SENIORITY RULES IN CASES OF MERGERS, ACQUISITIONS, SALES, ETC. UNDER CENTRAL STATES ROAD AND CARTAGE AGREEMENTS
"*Merger, purchase, acquisition, sale, etc.*
"1. If both carriers involved are solvent then the seniority lists of the two companies should be dovetailed so as to create a Master Seniority List based upon total years of service with either Company. This is known as dovetailing in accordance with years of seniority.
In the application of this rule it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc.
* * *"
"8. The parties acknowledge that specific situations may arise which may not be covered by the above rules, or in which the parties may feel that different treatment of the problem is necessary. In such situation, as provided in Article 5, Section 1, the Employer, the Union involved, and the Central States Drivers Council may mutually agree to such disposition of the seniority problems, as in

their judgment is appropriate under the circumstances. The Change of Operations Committee shall have the authority to add to or to modify these rules in specific situations presented to it."
3. Section 5. HOUSE CONCERNS— Where a "House Concern"—a private carrier—which has delivered its freight and merchandise with its own truck and driver decides to discontinue such method of operation and decides to lease or hire a truck driver from an Employer covered by this Agreement, such Employer shall take the driver formerly employed by the "House Concern" and assign him to the leased truck. Such driver shall hold seniority on the work of the "House Concern" as if actually employed by such concern; such driver's length of service for vacation shall be counted from the date from which the driver has been continuously in the employ of the "House Concern"; such driver shall have no right to bump any other employee in the employ of Employer nor can such driver be bumped by any other employee in the employ of Employer, provided, however, "House Concern" drivers shall accumulate overall company seniority from the first day the Company acquired the "House Concern" and such employee shall have all the benefits that go with such seniority. If, thereafter, the "House Concern" cancels the lease and enters into a new lease with another Employer for a truck and driver, such driver shall have the same status with the successor Employer as above provided. Nothing contained herein shall affect the particular seniority status of any employee mutually agreed to by Union and a particular Employer prior to the effective date of this Agreement.

The employers in this matter are essentially neutral and Tryon has moved to dismiss the action because it no longer employs drivers and it is not a party to the contract between the Union and M. T.L.R. Fees also moved (orally) to dismiss this action because it did not violate the contract in any way.

The pertinent facts are not in dispute and no evidence was offered by any of the parties. Essentially, the Union seeks to have this Court reverse the finding of the Arbitration Committee by concluding that it was erroneous in its reliance upon the seniority provisions applicable to mergers, sales, purchases and acquisitions (n. t. 39). No allegation of prejudice, fraud or bad faith is made by the Union in its complaint.

We concluded at the hearing that there was no showing of irreparable harm to merit the granting of a preliminary injunction and we denied the request.

The facts of this case show that the Arbitration Committee was requested to decide this seniority problem by the contending drivers. In reaching a decision, the Arbitration Committee determined that Tryon and Supplee-Biddle-Steltz "both House Concerns, both solvent, have merged" (n. t. 26). Concluding that this was a merger of the two companies, the Committee applied the particular seniority clause applicable to such transactions. (See Footnote 2.)

The Union chooses to ignore the consolidation of Tryon and Supplee-Biddle-Steltz as the motivating factor in Tryon's decision to engage a contract carrier to deliver its merchandise. The Arbitration Committee was not faced with the limited situation of a private carrier which simply decided to become a house concern. Here the Arbitration Committee had to reconcile the conflicting rights of two sets of employees who after the consolidation found themselves compelled to share work which they formerly performed independently. It was for the Arbitration Committee to interpret the contract[4] and apply it to the facts developed at the hearing.

"It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworkers v. Enterprise Corp., 363 U.S. 593, 599, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960).

While Fees wasn't involved in the consolidation of Tryon-Supplee-Biddle[5] certainly its employees were affected by the event and it was up to the Committee to equitably solve this problem which was voluntarily submitted to it for resolution. "The decision of the committee, reached after proceedings adequate under the agreement, is final and binding upon the parties, just as the contract says it is." Humphrey v. Moore, 375 U.S. 335, 351, 84 S.Ct. 363, 372, 11 L.Ed. 2d 370 (1964).

The Union bargained for a contract which provides for the final settlement of disputes of this nature by arbitration. It also bargained for and obtained a contract which provides for the interpretation of the contract by the Joint Arbitration Committee. Therefore, in the absence of any proof that the Com-

---

4. Article 7, Section 4(g) reads as follows:
   "(g) It is agreed that all matters pertaining to the interpretation of any provisions of this Agreement shall be referred by either party to the Joint Area Committee for final settlement. At the request of the Employer or Union representatives the Joint Area Committee shall be convened on seventy-two (72) hours' notice to handle matters so referred. In all cases pertaining to interpretation one representative from the Joint Area Committee under the MTLR Agreement and one representative from the Joint Area Committee under the Tri-Area Labor Association and Independent Associations' Agreement shall meet with an equal number of Union representatives to resolve such question of interpretation.

5. Prior to the merger or consolidation, Supplee-Biddle-Steltz was either Fees' principal account or one of its most important customers.

mittee exceeded its contract power in resolving this dispute, we are precluded from imposing our judicial will on any of the parties to the contract. There is no evidence of any patent disregard of the clear provisions of the contract. The mere fact that the Union disagrees with the Committee's interpretation of the agreement is not sufficient ground for this Court to overturn the award.

Our decision in this matter renders it unnecessary to rule on the various motions to dismiss at this time.

### ORDER

And now, this 12th day of August, 1964, the motion for a preliminary injunction is denied.